UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

RODOLFO GONZALEZ, §
§
     Plaintiff, §
VS. § CIVIL NO. M-09-210
§
MICHAEL J. ASTRUE, §
§
     Defendant. §

## <u>MEMORANDUM OPINION</u>

Plaintiff Rodolfo Gonzalez filed this action pursuant to 42 U.S.C. § 405(g), seeking review of the Commissioner of Social Security Administration's denial of Plaintiff's application for disability benefits.[1]  Plaintiff's application alleged that he became disabled at age 48 due mainly to back problems.  An Administrative Law Judge (ALJ) found that Plaintiff was not disabled because he is capable of performing certain jobs requiring unskilled light work.  While Plaintiff does not challenge the ALJ's finding that he has the physical capacity to perform a restricted range of light work, Plaintiff contends that the ALJ erred in determining his education level and that this error affected the outcome of Plaintiff's application for benefits.  (Docket No. 7, at 4.)  Pending before the Court are the parties' cross-motions for summary judgment.  (Docket Nos. 6, 8.)

A federal court may review the Commissioner's denial of benefits only to determine whether it is supported by substantial evidence and whether the proper legal standards were applied; a court may not re-weigh the evidence or substitute its judgment for the Commissioner's.  *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

---

[1] With the consent of the parties, the District Court referred this case to the undersigned for plenary handling pursuant to 28 U.S.C. § 636(c)(1).  (Docket Nos. 9, 11.)

After carefully considering the record in light of the deferential standard of review that applies, the Court finds that Plaintiff's appeal lacks merit.  While Plaintiff is correct that the ALJ erred in stating that he has a "limited education," this error was harmless because the ALJ did not rely on that finding in determining that Plaintiff was not disabled.  Rather, the ALJ's ultimate decision was based on a finding that Plaintiff was at least literate—a finding that is supported by substantial evidence in the record.  Accordingly, for the reasons explained further below, the Court will grant the Commissioner's motion for summary judgment.

## I. BACKGROUND[2]

On April 24, 2006, Plaintiff applied for Supplemental Security Income (SSI) disability benefits under section 1614(a)(3)(A) of Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f.  (Tr. 81-83.)  In his application, Plaintiff alleged that he became disabled on June 25, 2005.

Plaintiff's applications were denied initially and on reconsideration.  (Tr. 41-42.)  Plaintiff then requested a hearing before an ALJ, which was held on July 10, 2008, in Harlingen, Texas.  (Tr. 20-40, 59.)  After the hearing, the ALJ issued a written decision finding that Plaintiff was not disabled because "there are jobs that exist in significant numbers in the national economy" that Plaintiff can perform, given that he retains "the residual functional capacity to perform a limited range of light work."  (Tr. 9–19.)

In considering Plaintiff's challenge to the ALJ's decision, the evidence in the record will be summarized.[3]

_____

[2]  The Commissioner has filed a transcript of the record of the administrative proceedings, which will be cited as "Tr."

2

A.      **Education and Work Experience**

Plaintiff was 48 years old on the date that he alleges he became disabled, September 13, 2005.[4]  (*See* Tr. 81.)  Plaintiff completed the fifth grade in school; he attended sixth grade for three or four months before leaving school.  (Tr. 25-26, 102.)  While in school, he attended regular classes (not special education classes).  (Tr. 24, 102.)

There is conflicting evidence in the record regarding Plaintiff's ability to read and write.  On a disability report submitted by Plaintiff (or by someone on his behalf), Plaintiff stated that he could "read and understand English" and that he could "write more than [his] name in English."  (Tr. 97.)  In his daily activity questionnaire (which his sister helped him complete), Plaintiff stated that his physical impairments did not affect his ability to hear, speak, or read a newspaper.[5]  (Tr. 110.)   However, during the evidentiary hearing, Plaintiff testified that he cannot read, spell, or write.  (*Id.*)

Plaintiff last worked in 1984, over twenty years prior to filing his disability application.  (*See* Tr. 103.)  Plaintiff's previous jobs including the following: steel factory worker, oil field worker, and vegetable picker.  (Tr. 26, 29, 121.)  In his job as a

---

[3]   Generally, the Court must "scrutinize" the record to determine whether the ALJ's decision is supported by substantial evidence.  *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).  Here, Plaintiff does not challenge the ALJ's finding regarding his physical residual functional capacity.   Nevertheless, the medical evidence will be summarized to provide context for the contested issues.

[4]  Plaintiff later amended his application to reflect an alleged disability onset date of March 5, 2007, his fiftieth birthday.  (Tr. 136.)

[5]  Consistent with Plaintiff's representations in these reports, during his disability field office interview, the interviewer did not observe Plaintiff to have difficulties with reading, understanding, talking, or writing.  (Tr. 107.)

vegetable picker, Plaintiff routinely lifted sacks of vegetables weighing up to 50 pounds. (Tr. 29.)

**B.     The Medical Evidence**

Plaintiff's initial application listed his conditions limiting his ability to work as follows: "[b]ack problems; kidney & liver problems; throat problems."  (Tr. 98.)  Plaintiff also alleged that: he "cannot pick up heavy things because if I do I have to rest every hour per doctor's orders"; he has "constant pain in [his] liver"; and he "cannot bend [his] fingers to grab things."  (*Id.*)  Although Plaintiff does not challenge the ALJ's findings as they relate to his medical conditions, the medical evidence in the record will be briefly summarized to provide context for the issue that Plaintiff raises (relating to his education level).

Although Plaintiff had not worked in over twenty years prior to his alleged disability onset date, the medical records submitted in support of his claim begin on June 23, 2005, when he was admitted at Rio Grande Regional Hospital complaining primarily of fever, vomiting, nausea, and diarrhea.  (Tr. 141-44.)  Plaintiff was released two days later.  (Tr. 166.)   Dr. Ralph Alhalel diagnosed Plaintiff with esophagitis and mild gastritis.  (Tr. 148.)

The next month, on July 29, 2005, Plaintiff went to see Dr. Jaime Hernandez, complaining of heartburn, frequent urination, and insomnia.  (Tr. 190.)  Dr. Hernandez diagnosed Plaintiff with GERD,[6] BPH[7], and chronic liver disease.  (*Id.*)  Three months

---

[6] GERD is an "[a]bbreviation for gastroesophageal reflux disease."  STEDMAN'S MEDICAL DICTIONARY 740 (27th ed. 2000).

[7] BPH stands for "[b]enign prostatic hyperplasia" and "is an enlarged prostate gland."  WebMD, *Prostate Enlargement/BPH Health Center*,

later, on October 7, 2005, Plaintiff returned to Dr. Hernandez's office, complaining of shoulder pain, a chest rash, and heartburn.  (Tr. 189.)  Plaintiff stated that other than these complaints, he had "been doing well."  (*Id.*)

After Plaintiff filed his application for disability benefits, the Texas Rehabilitation Commission referred him to Dr. Monique Popek for a consultative examination.  (Tr. 193-96.)  Dr. Popek examined Plaintiff on June 26, 2006.  Plaintiff complained primarily of lower back pain and lower leg cramps.  (Tr. 193-94.)  The exam revealed "moderate scoliosis" and tenderness in his spine; however, Dr. Popek also observed the following (among other things): Plaintiff's neurological exam was normal; both his fine and gross movements were normal; and he exhibited full range of motion in all his joints.  (Tr. 195.)  Ultimately, Dr. Popek diagnosed Plaintiff with tremors, moderate dorsal scoliosis, peripheral vascular disease (PVD), mild degenerative disease of the lumbar spine, and tinea pedis.  (Tr. 196.)

On August 9, 2006, a state agency medical consultant, Dr. Kim Rowlands, reviewed Plaintiff's medical records and performed a residual functional capacity (RFC) assessment.  (Tr. 208-15.)  Dr. Rowlands determined that Plaintiff had the ability to do the following: lift and/or carry 10 pounds frequently and 20 pounds occasionally; sit for 6 hours out of an 8-hour workday; stand or walk at least 2 hours out of an 8-hour workday; and push and/or pull without limitation.  (Tr. 209.)  The doctor also noted some limitations: Plaintiff could only occasionally climb stairs, kneel, crouch, and crawl; and he could never climb ladders.  (Tr. 210.)  She found that Plaintiff had no other limitations, including no "communicative limitations."  (Tr. 211-12.)  Dr. Rowlands

http://men.webmd.com/prostate-enlargement-bph/benign-prostatic-hyperplasia-bph-topic-overview (last updated Mar. 23, 2010).

concluded that Plaintiff's alleged subjective limitations were not fully supported by objective medical evidence.  (Tr. 213.)

Nine months later, on May 15, 2007, the Department of Assistive and Rehabilitative Services referred Plaintiff to Dr. Juan Salazar, for a consultative examination.  (Tr. 247-57.)  At the examination, Plaintiff complained of lower back pain that "radiates down both lower extremities."  (Tr. 247.)  Plaintiff reported that he was "only able to walk two or three blocks," although he could sit and stand with no difficulties.  (*Id.*)  The exam revealed a "fine tremor in the upper extremities," "some tenderness in the sacral area" of his back, normal gait, and normal range of motion in his shoulders and knees.  (Tr. 248.)  A scan of his lumbar spine was "unremarkable."  (Tr. 249.)  Ultimately, Dr. Salazar diagnosed Plaintiff with dysphagia[8] secondary to esophagitis, ulcers, BPH, degenerative disk disease, and chronic obstructive pulmonary disease (COPD).  (Tr. 248-49.)

About a week later, on May 23, 2007, another state agency physician, Dr. Randal Reid, reviewed Plaintiff's medical records and performed a RFC assessment.  (Tr. 258-65.)  Dr. Reid determined that Plaintiff had the ability to do the following: lift and/or carry 10 pounds frequently and 20 pounds occasionally; sit for 6 hours out of an 8-hour workday; stand or walk 6 hours out of an 8-hour workday; and push and/or pull without limits.  (Tr. 259.)  In addition, Dr. Reid determined that Plaintiff was limited in his ability to reach and in his gross and fine motor manipulations.  (Tr. 261.)  Consistent with Dr. Rowlands's assessment, Dr. Reid found that Plaintiff had no other limitations, including no "communicative limitations."  (Tr. 260-62.)  Dr. Reid concluded that Plaintiff's

---

[8] Dysphagia refers to a "[d]ifficulty in swallowing."  STEDMAN'S MEDICAL DICTIONARY 554 (27th ed. 2000).

alleged subjective limitations were not supported by objective medical evidence.  (Tr. 263.)

C.     **The Evidentiary Hearing**

An evidentiary hearing was held on July 10, 2008, in Harlingen, Texas.  (Tr. 20–40.)  Two witnesses testified: Plaintiff, represented by an attorney, and Richard Miller, a vocational expert.  (Tr. 21.)

Plaintiff testified about his education and intellectual abilities.  Plaintiff stated that he completed the fifth grade and attended the sixth grade for three or four months.  (Tr. 25.)  He was kicked out of school for not making academic progress and for fighting.  (Tr. 25-26.)  When asked if he had any difficulties reading or writing, Plaintiff stated: "I can't read a newspaper.  I cannot spell and I cannot write.  I can copy.  You give me a paper, I can copy whatever's in the paper, but I – you tell me to write from my own head, I can't spell."  (Tr. 26.)  Plaintiff then emphasized, "I can't read, I can't spell and I can't write."  (*Id.*)

Plaintiff has not worked in the past 20 or 30 years; he last worked in a "steel factory, in the oil fields and picking [vegetables] in the fields."  (Tr. 26.)  In explaining why he believes he cannot work, Plaintiff stated that he has a "bad back" and his throat closes.  (Tr. 27.)  Plaintiff explained that he underwent therapy for over a year for a pinched nerve in his lower back (although he did not say when this occurred and there are no medical records about this).  (*Id.*)  Plaintiff does not take any medication for the pain in his back, and he does not use a cane to ambulate.  (*Id.*)  According to Plaintiff, however, one of his doctors told him that for every 50 pounds he picks up, he must rest

for one hour.  (Tr. 29.)  Due to this restriction and his back pain, Plaintiff's believes that he is unable to work.[9]  (*Id.*)

In response to questions by his attorney, Plaintiff stated that he has a procedure for his throat about once a year where a doctor has to open it up.  (Tr. 30.)  Plaintiff can drive, but he is too paranoid to drive on the expressway.  (*Id.*)  He is not comfortable around people and has trouble sleeping.  (Tr. 31.)  When asked how he supported himself despite not working for so many years, Plaintiff explained that he is primarily supported by his elderly mother.  (Tr. 32.)  Plaintiff claimed that he no longer drinks alcohol or smokes cigarettes.[10]  (Tr. 32-33.)

Plaintiff disagreed with the state residual functional capacity assessments.  He stated that he can lift 20 pounds, but when the weight accumulates to more than 50 pounds, he has to take a break.  (Tr. 34.)  Plaintiff also stated that he has trouble sitting and walking, and he cannot do either for more than two hours at a time.  (Tr. 34, 36-37.)  Plaintiff's daily activities include cooking, paying the bills, grocery shopping, and helping his mother clean the house.  (Tr. 35.)

The vocational expert (VE), Mr. Miller, responded to a hypothetical question posed by the ALJ.  (Tr. 38.)  The ALJ asked him to "consider a hypothetical individual [Plaintiff's] age, education and work background as [Plaintiff]," who has the capacity to lift 10 pounds frequently and 20 pounds occasionally, stand/walk and sit for 6 hours (with normal breaks), but who is "also limited to no overhead reach[ing] and limited to

---

[9]  Plaintiff also described other problems, including difficulties with his throat and memory loss.  (Tr. 28-29.)

[10]  As will be discussed in the context of the ALJ's credibility finding, *see infra* Part II.E, there is other evidence in the record contradicting Plaintiff's testimony about his alcohol and tobacco use.  (*See* Tr. 144-47, 193-94, 247-48.)

frequently handling and fingering." (*Id.*)  The VE stated that with those limitations, there were jobs in the national economy that Plaintiff could perform, including:

> 1) Night Cleaner - representing approximately 192,000 jobs in the national economy and 15,000 in Texas;

> 2) Lobby Attendant – representing approximately 32,000 jobs in the national economy and 2,400 in Texas; and

> 3) Parking Lot Attendant – representing 51,000 jobs in the national economy and 2,800 in Texas.  (*Id.*)

The ALJ then asked the VE to assume the "hypothetical individual was further limited," and he responded that he would not be able to maintain employment.  (Tr. 39.)  Counsel for Plaintiff did not cross-examine the VE.

**D.     The ALJ's Decision**

In making his decision, the ALJ relied on the testimony that was presented at the hearing and the medical evidence in the record.  (Tr. 12–19.)  The ALJ applied the five-step method for evaluating disability claims.[11]

The ALJ first found (at step one) that Plaintiff had not performed substantial gainful activity since the alleged onset date of disability.  (Tr. 14.)  In considering the severity of Plaintiff's impairments (step two), the ALJ determined that Plaintiff had the following "severe" medical impairments: degenerative disc disease in the lumbar spine, chronic obstructive pulmonary disease (COPD), and peripheral vascular disease (PVD). (*Id.*)  The ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in the regulations (step three).  (*Id.*)

---

[11] The five-step process for determining whether a plaintiff is eligible for benefits will be explained further in the Standard of Review section, *infra* Part II.A.

Next, the ALJ assessed Plaintiff's residual functional capacity (RFC) to do work-related activities.  (Tr. 15-17.)  In addition to his review of the medical evidence, the ALJ analyzed Plaintiff's subjective symptoms in accordance with the regulations.  (Tr. 15.) The ALJ noted that the "medical evidence of record does not establish a pattern of continuing severity for [Plaintiff's] impairments"; in particular, he "has sought only intermittent medical treatment," which is inconsistent with "a totally disabled individual." (Tr. 16.)   Plaintiff's testimony describing severe symptoms and limitations "is not supported with objective medical evidence and findings."  (Tr. 17.)  The ALJ found that Plaintiff's "statements concerning his physical impairments and the impact on his ability to work are not entirely credible to the extent alleged in light of the medical history, findings made on examination, and reports of observations of his treating sources."  (*Id.*)

The ALJ determined that Plaintiff had the ability to perform a limited range of light work, which includes: lift/carry 20 pounds occasionally and 10 pounds frequently; sit, stand, and walk for 6 hours out of an 8-hour work day; no overhead reaching; and frequent handling and fingering.  (Tr. 15.)  In reaching this conclusion, the ALJ relied principally on the assessment and opinion of Dr. Rowlands.  (Tr. 17.)

The ALJ then found (at step four) that Plaintiff had "no past relevant work."  (*Id.*) Plaintiff "has a limited education and is able to communicate in English (20 CFR 416.964)."  (*Id.*)  Because Plaintiff had not worked for many years prior to the alleged disability onset date, the ALJ could not make any finding at step four on whether Plaintiff could perform his past work.

The ALJ thus considered (at step five) whether, taking into account Plaintiff's RFC and various vocational factors, there were jobs existing in significant numbers in the

national economy that Plaintiff could perform.  (Tr. 17-18.)  Because Plaintiff's ability to perform the requirements of a light range of work "has been impeded by additional limitations," the ALJ used the medical-vocational rules (Grid Rules) "as a framework for decision making."   (Tr. 18 (citing SSRs 83-12 and 83-14).)   Based on the VE's testimony, the ALJ found that Plaintiff could perform jobs existing in significant numbers in the national economy; specifically, Plaintiff could do work as a night cleaner, lobby attendant, and parking lot attendant.  (*Id.*)  As such, the ALJ concluded that Plaintiff is "not disabled."  (*Id.*)

### E.  Procedural History

Plaintiff sought administrative review of the ALJ's decision.  (Tr. 7-8.)  The Appeals Council concluded that there was no basis for challenging the decision, rendering it the Commissioner's final decision for purposes of judicial review.  (Tr. 1-4.)  The instant action followed in which Plaintiff seeks review of the decision pursuant to 42 U.S.C. § 405(g).  (Docket No. 1.)  The parties' motions for summary judgment are pending.  (Docket Nos. 6, 8.)  Those motions will be analyzed in light of the applicable standard of review.

## II.  ANALYSIS

### A.  Standard of Review

To qualify for benefits under the Social Security Act (the "Act"), Plaintiff bears the burden of proving that he is disabled.  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."

42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* at §§ 423(d)(3), 1382c(a)(3)(D).

To determine whether a claimant is disabled within the meaning of the Act, the Commissioner applies the following five-step inquiry:

(1) whether the claimant is currently working in substantial gainful employment;

(2) whether the claimant suffers from a severe impairment;

(3) whether the claimant's severe impairment is sufficient under the pertinent regulations to support a finding of disability;

(4) whether the claimant is capable of returning to his or her past relevant work; and, if not,

(5) whether the impairment prevents the claimant from performing certain other types of employment.

*See* 20 C.F.R. §§ 404.1520, 416.920.

A finding that a claimant is disabled or not disabled at any point in the five-step inquiry is conclusive and terminates the analysis. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). At steps one through four, the burden of proof rests upon the claimant to show that he is disabled. If the claimant satisfies this responsibility, the burden then shifts to the Commissioner at step five of the process to show that there is other gainful employment that the claimant is capable of performing despite his existing impairments. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). Although the burden is initially on the Commissioner at step five, once the Commissioner makes a showing that the claimant can perform other work, the burden shifts back to the Plaintiff to rebut the

finding that there are jobs that exist in significant numbers that the Plaintiff could perform. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "Throughout the process, the ultimate burden of establishing disability remains with the claimant." *Strempel v. Astrue*, 299 F. App'x 434, 437 (5th Cir. 2008) (citing *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983)).

In this case, the ALJ found at step four that, while Plaintiff was able to perform restricted light work, he had no past relevant work (because he had not worked in over 20 years). At step five, the ALJ found, based on the vocational expert's testimony, that Plaintiff was not disabled because he could perform jobs existing in significant numbers in the national economy. (Tr. 17-18.)

A federal court's review of the Commissioner's final decision is limited to determining whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Masterson*, 309 F.3d at 272. Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* Evidentiary conflicts are for the Commissioner to resolve, not the courts. *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999). This Court may neither reweigh the evidence in the record, nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if substantial evidence is present. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988). In applying this deferential standard, however, the Court is not a "rubber stamp" for the

Commissioner's decision, particularly given the importance of the benefits in question. *Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 500 (S.D. Tex. 2003).

**B.     Issues**

Plaintiff does "not contest the AJL's findings at Steps 1 through 4 of the sequential evaluation," including the finding that he is physically capable of performing a restricted range of light work.  (Docket No. 7, at 3.)  Rather, Plaintiff claims that the ALJ erred at step five of the disability analysis in finding that he has a "limited" education level.  (Docket No. 7, at 4.)  Although Plaintiff separates this issue into four sub-issues,[12] his principal argument is that the ALJ erred in determining his education level and that this was not harmless error because, had the ALJ found Plaintiff illiterate, Grid Rule 202.09 would dictate that he was disabled.  (*Id*. at 9.)

The Commissioner argues that the ALJ correctly determined that Plaintiff has a "limited education" and is "literate and able to communicate in English."  (Docket No. 8-1, at 4-7.)  The Commissioner contends that the denial of benefits should be affirmed because "[s]ubstantial evidence supports the Commissioner's final administrative decision that Plaintiff was not disabled under the Social Security Act."  (*Id*. at 9.)

The issues raised by the parties will be addressed in the context of the standard of review that applies in social security cases (as discussed above).

---

[12]   Specifically, Plaintiff asserts the following: 1) the ALJ's finding that Plaintiff has a "limited" education is wholly unsupported by substantial evidence; 2) evidence in the record that Plaintiff cannot read or write rebuts a finding that he functions at a fifth grade level; 3) the Commissioner's failure to carry his burden to prove that Plaintiff is at least literate is not mere "harmless" error; and 4) the VE's testimony that there were jobs that exist within Plaintiff's RFC does not cure the ALJ's errors.  (Docket No. 7, at 4.)

C.      **Plaintiff's Education Level**

At step five of the disability analysis, an ALJ must consider a claimant's RFC along with vocational factors, such as education, in determining whether he is able to do other work.  20 C.F.R. § 416.920(a)(4)(v) ; *see also Pena v. Astrue*, 271 F. App'x 382, 384 (5th Cir. 2008) (a "claimant's education is a vocational factor the ALJ considers in determining what jobs a claimant is capable of performing").  As relevant here, the regulations describe the following education levels:

> (1) *Illiteracy*. Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling.
>
> (2) *Marginal education*. Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education.
>
> (3) *Limited education*. Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education.

20 C.F.R. § 416.964(b).

Here, the ALJ found (without explanation) that Plaintiff "has a limited education and is able to communicate in English."  (Tr. 17 (citing 20 C.F.R. § 416.964).)  No one disputes that Plaintiff can communicate in English.  As to education level, Plaintiff states that he completed school up to the fifth grade (attending the sixth grade for three or four months).  (Tr. 25, 102.)  There is no evidence in the record to refute this, nor is there any evidence that Plaintiff had the ability to function above a fifth grade level in reasoning, arithmetic, and language skills.  Because "limited education" generally means that a

claimant has formal schooling at the "7th grade through the 11th grade level," 20 C.F.R. § 416.964(b)(3), the ALJ's finding that Plaintiff "has a limited education" is not supported by substantial evidence in the record.  The Commissioner's argument to the contrary lacks merit.  (Docket No. 8-1, at 4-5.)

However, this error does not end the inquiry.   "Procedural perfection in administrative proceedings is not required" as long as "the substantial rights of a party have not been affected."  *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).  The harmless error rule applies in reviewing the Commissioner's decisions in Social Security cases.  *Id.*

## D.    Harmless Error Analysis

Recognizing this, Plaintiff argues "that the ALJ's unsupported finding was not mere harmless error."  (Docket No. 7, at 9.)  This is "because had the ALJ properly found that [Plaintiff] Gonzalez functions at the 'illiterate' level of education, Gonzalez would have been found 'disabled'" pursuant to Grid Rule 202.09.  (*Id.*)  As Plaintiff points out, Grid Rule 202.09 mandates that a claimant be found disabled if he is "closely approaching advanced age,"[13] is limited to light work, has no past relevant work, and is also illiterate.  (*Id.*)

At step five of the disability analysis, the ALJ considered "the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines ["Grid Rules" or "guidelines"], 20 C.F.R. Part 404,

---

[13]  Plaintiff was considered a "younger individual" (age 18-49) as of the date he filed his application for disability benefits.  (Tr. 17.)  While his application was pending, he turned 50, which is considered "approaching advanced age."   (*Id.*)  As noted, *see supra* n.4, Plaintiff later amended his application so that his alleged disability onset date coincides with his 50th birthday (March 5, 2007).  As such, Plaintiff is considered to be "closely approaching advanced age" for purposes of his request for disability benefits.

Subpart P, Appendix 2." (Tr. 18.) The Grid Rules were promulgated to "improve both the uniformity and efficiency" of the step-five determination. *Heckler v. Campbell*, 461 U.S. 458, 461 (1983). The Supreme Court has described the purpose of the Grid Rules as follows:

> These guidelines relieve the Secretary of the need to rely on vocational experts by establishing through rulemaking the types and numbers of jobs that exist in the national economy. They consist of a matrix of the four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy. Where a claimant's qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion as to whether work exists that the claimant could perform. If such work exists, the claimant is not considered disabled.

*Id.* at 461-62 (footnotes omitted). In other words, where the characteristics of the claimant correspond to the criteria of one of the rules, "the ALJ may rely exclusively on the Guidelines in determining whether there is other work available that the claimant can perform." *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

Consistent with this, the ALJ explained that "[i]f the [Plaintiff] can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules [Grids] direct a conclusion of either 'disabled' or 'not disabled' depending upon the claimant's specific vocational profile (SSR 83-11)." (Tr. 18.) Here, however, because Plaintiff's ability to perform the requirements of a light range of work "has been impeded by additional limitations," the Grid Rules could not be used to direct a finding that Plaintiff was not disabled. (*Id.*) Given this, the ALJ used the Grid Rules "as a framework for decision making." (*Id.* (citing SSRs 83-12 and 83-14).)

The ALJ used Grid Rule 202.10 as the framework for his decision. (Tr. 18.) Grid Rule 202.10 applies to a person "closely approaching advanced age," who has no relevant

previous work experience (or unskilled work experience), with the following education level: "Limited or less—at least literate and able to communicate in English."  20 C.F.R. Pt. 404, Subpt. P, App. 2, Table 2.  For a claimant whose characteristics correspond to Grid Rule 202.10, the guidelines direct a finding of not disabled.  *Id.*

Because the ALJ found that Plaintiff could not perform the physical requirements for the full range of light work, Grid Rule 202.10 did not direct a decision, and the ALJ enlisted the assistance of a vocational expert to determine "whether jobs exist in the national economy for an individual with [Plaintiff's] age, education, work experience, and residual functional capacity."[14]  (Tr. 18.)  The vocational expert opined that there were unskilled jobs (existing in significant numbers) that Plaintiff could perform despite his limitations, including night cleaner, lobby attendant, and parking lot attendant.  (Tr. 18.)

Whether Plaintiff should have been found disabled pursuant to Grid Rule 202.09 (as he contends) or whether Grid Rule 202.10 applied as a framework for decision making (as the ALJ found) turns on whether Plaintiff is illiterate.[15]  In applying Grid Rule

---

[14]   "How, exactly, the grids provide … a framework is unclear, and both legal scholars and the courts have noted the disconnect."  *Thompson v. Comm'r of Social Security Admin.*, No. 00-CV-656, 2002 WL 31098511, at \*5 (E.D. Tex. July 30, 2002) (string cite omitted).  However, one thing is clear: Where the claimant's characteristics do not "coincide exactly" with a Grid Rule, the ALJ should introduce expert vocational testimony to further assist him in his "Grids framework" guided analysis.  *See Lawler v. Heckler*, 761 F.2d 195, 197-98 (5th Cir. 1985).  That is what the ALJ did here.

[15]   The characteristics for the two Grid Rules are identical except for education level.  Grid Rule 202.09 applies where a claimant is "illiterate or unable to communicate in English," and Grid Rule 202.10 applies where a claimant is "at least literate and able to communicate in English."  Because Plaintiff does not dispute the ALJ's finding that he is able to communicate in English, the only issue is whether or not Plaintiff is "at least literate."  In deciding that issue, it matters little (if any) whether Plaintiff had a "limited education" as defined by the regulations (generally considered "7th grade through the 11th grade of formal education") or a "marginal education" (generally

18

202.10 as a framework to determine whether Plaintiff was capable of performing other work, the ALJ necessarily found that Plaintiff was "at least literate."  The question thus becomes whether the ALJ's literacy finding is supported by substantial evidence.[16]

### E.      Substantial Evidence for Literacy Finding

Plaintiff contends that the ALJ's "implicit finding" that Plaintiff is literate is "unsupported by any evidence sufficient to carry [the Commissioner's] burden of proof." (Docket No. 7, at 8.)  Plaintiff argues that "contradictory evidence reveals that [Plaintiff] does not read and write at a fifth grade level commensurate with his formal education; rather, the evidence shows he is illiterate."  (Docket No. 7, at 7.)    In particular, Plaintiff emphasizes his hearing testimony in which he stated: "I can't read, I can't spell, and I can't write."  (*Id*. at 7 (citing Tr. 26).)   The Commissioner contends that "the ALJ correctly found that Plaintiff was at least literate and able to communicate in English" because "Plaintiff certainly had a limited ability to read and write."  (Docket No. 8-1, at 5-6.)  The Commissioner also states that Plaintiff "failed to establish – or even allege – that he was illiterate."  (*Id.* at 6.)

In considering Plaintiff's contention that the ALJ's literacy finding is "unsupported by any evidence," the evidence in the record should be viewed in light of the definition of "illiteracy" in this context:

> Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as

"formal schooling at a 6th grade level or less").  *See* 20 C.F.R. § 416.964(b)(2), (3) .  The only material issue is whether Plaintiff was "at least literate."

[16]    As can be seen, Plaintiff's harmless error argument turns on whether the ALJ properly found that Plaintiff is "at least literate."   It should be noted that this is *not* the same issue addressed in Plaintiff's principal claim, which was whether the ALJ erred in finding that Plaintiff had a "limited education."

instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling.

20 C.F.R. § 416.964(b)(1).  Contrary to Plaintiff's argument, there is evidence in the record that tends to support the ALJ's finding that Plaintiff is at least literate.

To begin with, in applying for disability benefits, Plaintiff not only failed to allege that he was illiterate, but he affirmatively represented that he could both read and write. In his initial "Disability Report," Plaintiff responded to the following questions:

- "Can you speak and understand English?"

- "Can you read and understand English?"

- "Can you write more than you name in English?"

(Tr. 97.)  Plaintiff answered "yes" to all three questions.  (*Id*.)  In response to other questions in the Disability Report, Plaintiff stated that the highest grade of school he completed was the "5th grade" and that he did not attend any special education classes. (Tr. 102.)  Plaintiff's own statements that he could both read and write support the ALJ's finding that he is literate.[17]

Plaintiff's completion of the fifth grade is also evidence that tends to support the ALJ's finding that Plaintiff is literate.  An illiterate person generally "has had little or no

---

[17]  Plaintiff's answers on the Disability Report form are typed, and the form is unsigned.  However, Plaintiff has suggested no reason to question its authenticity.  The form was submitted in support of Plaintiff's application for disability benefits, and it contains personal information that presumably came directly from him, including his social security number, medical history, and physical impairments. (Tr. 97, 100-02.) Plaintiff's responses to the questions on the form are made in the first person; for example, Plaintiff described how his medical impairments limit his ability to work as follows: "I cannot pick up heavy things because if I do I have to rest every hour per doctor's orders.  I have constant pain in my liver and I cannot bend my fingers to grab things."  (Tr. 98.)  Even assuming that someone helped Plaintiff to complete the form, it is apparent that the information came from Plaintiff himself.  At the hearing, the ALJ admitted the Disability Report into evidence (along with other exhibits) with the agreement of Plaintiff's counsel.  (Tr. 23.)

formal schooling."  20 C.F.R. § 416.964(b)(1); *see also Pena v. Astrue*, 271 F. App'x

382, 384-85 (5th Cir. 2008) (noting that the regulations consider a claimant's sixth grade

education "evidence of marginal education").

But this is not to say that Plaintiff's formal schooling is dispositive in determining

literacy.  As Plaintiff correctly points out, the regulations also note that the significance

of a claimant's formal education "may depend upon how much time has passed" and

other factors:

> Formal education that you completed many years before your impairment
> began, or unused skills and knowledge that were a part of your formal
> education, may no longer be useful or meaningful in terms of your ability
> to work. Therefore, the numerical grade level that you completed in school
> may not represent your actual educational abilities. These may be higher
> or lower. However, if there is no other evidence to contradict it, we will
> use your numerical grade level to determine your educational abilities.

20 C.F.R. § 416.964(b).  Plaintiff cites *Albritton v. Sullivan*, 889 F.2d 640 (5th Cir.

1989), in support of his contention that his fifth grade education does not support the

ALJ's finding that he is literate.  In *Albritton*, the Fifth Circuit applied the regulation

quoted above and found that the claimant's "formal [fourth grade] schooling was no

longer meaningful . . . in the face of uncontradicted evidence that he was functionally

illiterate."  889 F.2d at 643 (citation omitted).  In contrast to *Albritton*, here there is

contradictory evidence regarding Plaintiff's ability to read and write.  While Plaintiff's

completion of the fifth grade is not dispositive on the issue of his literacy, it nevertheless

constitutes some evidence that tends to support the ALJ's finding.

Plaintiff's written statements that he could read and write are consistent with his

"face-to-face" interview at a Social Security Administration field office.  (Tr. 105-08.)

The interviewer was required to complete a summary of the interview, which included

their observations about Plaintiff's abilities in a number of areas.  (Tr. 106-07.)  The interviewer was given the following instructions: "If the claimant had difficulty with the following, explain in Observations, or show 'No' or 'Not observed/perceived.'"  (Tr. 106.)  In response to whether Plaintiff had any difficulty in the areas of reading, understanding, talking, answering, or writing, the interviewer answered "no" as to each. (Tr. 107.)  The only difficulty noted by the interviewer was that Plaintiff had trouble "concentrating."  (*Id.*)  In describing Plaintiff's "behavior" during the interview and "degree of limitations," the interviewer stated:

> Claimant was neat in appearance but seemed nervous throughout the interview.  He claimed he had a bad memory and could not remember any medical information asked.   No other physical or mental impairments [were] observed.

(*Id.*)  While not dispositive, the interviewer's observations tend to support the ALJ's finding that Plaintiff is literate.[18]

Plaintiff's responses to the "Daily Activity Questionnaire" are likewise consistent with his initial statement that he could read and write.  The questionnaire asked whether

---

[18]  Standing alone, the interviewer's observations would not be strong evidence. In *Albritton*, both the claimant and his wife gave "uncontradicted" testimony that he could not read and write.  889 F.2d at 642-43.   In a footnote, the Fifth Circuit addressed a form completed by an interviewer, which was the "only" evidence in the record that might "conceivably" support the conclusion that the claimant could read and write.  *Id*. at 643 n.2.   The form instructed the interviewer "to indicate if 'any difficulty was observed,'" and the interviewer responded "no" to reading and writing.  *Id*.  The Fifth Circuit found that the form had "little probative value" since it did not indicate whether the claimant's reading and writing ability were actually tested or observed during the interview.  *Id*.  The instant case is somewhat distinguishable since the instructions to the interviewer here directed the interviewer to answer either "No" or "Not observed/perceived," suggesting that a "no" answer meant that the interviewer had some opportunity to perceive the claimant's ability in that area.   More importantly, unlike *Albritton*, here there is other evidence of Plaintiff's ability to read and write, including his own representation in his Disability Report.  While the interviewer's observations in this case are less than compelling, they provide some support for the ALJ's finding that Plaintiff is literate.

"your physical problems limit any of the following activities?"  (Tr. 110.)  In responding to the activities of hearing, speaking, and reading a newspaper, Plaintiff answered "no."[19] (*Id.*)

This questionnaire is hand-written and apparently completed by Plaintiff's sister. (Tr. 111.)   Plaintiff points to his sister's assistance as evidence that he is illiterate. (Docket No. 7, at 7.)   It is true that this is an inference that could be drawn, but (like much of the evidence relating to this issue) it is not dispositive.   While Plaintiff may have requested assistance completing the form, it does not mean that he met the definition for being illiterate; for example, he may be able to read or write a simple message but still feel more comfortable having assistance in filling out the questionnaire (which could affect whether or not he received significant monetary benefits).

Plaintiff relies almost exclusively on his own hearing testimony in arguing that the ALJ's literacy finding is unsupported by any evidence.   As the Commissioner points out, however, Plaintiff's testimony—taken as a whole—suggests that he was somewhat uneasy in claiming that he was completely illiterate.   (Docket No. 8-1, at 6.)   In response to the ALJ's initial question about whether he had any difficulties reading or writing, Plaintiff stated:

> I can't read a newspaper.  I cannot spell and I cannot write.  I can copy. You give me a paper, I can copy whatever's in the paper, but I—you tell me to write from my own head, I can't spell.

---

[19]   This response tends to support the ALJ's literacy finding, but, here again, it is not strong evidence on that point.  Although Plaintiff indicated that his physical problems did not limit his ability to read the newspaper, it could be argued that this response does not reveal whether or not he could read a newspaper in the first place.  On the other hand, it could also be argued that Plaintiff would have responded that the question was not applicable if he was unable to read a newspaper.  In any event, Plaintiff's response on this form is consistent with his statement in the Disability Report that he could read.

(Tr. 26.)  Plaintiff's testimony about his daily activities also tends to belie the conclusion that he is illiterate.  Specifically, Plaintiff testified that he pays the household bills and does the grocery shopping.  (Tr. 35.)  Such activities suggest that Plaintiff can "read or write a simple message such as instructions or inventory lists," which is contrary to the conclusion that he is illiterate.  *See* 20 C.F.R. § 416.964(b)(1).

Perhaps more importantly, in arguing that Plaintiff's hearing testimony conclusively shows that he is illiterate, Plaintiff fails to acknowledge the ALJ's role in assessing the credibility of that testimony.  That key issue was noted by both the ALJ and Plaintiff's counsel at the close of the hearing:

> ALJ:    If I accept the Claimant's testimony to be credible today, the Claimant is illiterate, has no past relevant work and has a light RFC—
>
> ATTY:  That's correct, Your Honor, if you accept his testimony that he is illiterate, as he said.

(Tr. 39.)

The ALJ's decision shows that he did not find Plaintiff's testimony to be credible.  The ALJ's determination that Plaintiff is "not disabled" is necessarily based on the finding that Plaintiff is at least literate.  Although the ALJ did not address Plaintiff's credibility as it relates specifically to his literacy, the ALJ found that Plaintiff's testimony lacked credibility in several respects.  Specifically, the ALJ explained in some detail why Plaintiff's "testimony is not supported with objective medical evidence."  (Tr. 15-16.)  As the ALJ also noted, Plaintiff's "reported activities of daily living have been inconsistent with his complaints."  (Tr. 17.)

The ALJ found that Plaintiff's hearing testimony was inconsistent with what he had said previously.  For example, "[h]e stated to a physician that he could lift 25 pounds,

but stated at the hearing that he can only lift 10 pounds." (Tr. 17.) "Most notably, the [Plaintiff] has provided inconsistent information with regard to his smoking and drinking." (*Id.*) During the hearing, Plaintiff testified that he had stopped smoking "probably 20 year[s], 25 years ago." (Tr. 33.) He also claimed to have stopped drinking when he "got out of the hospital" (apparently referring to his June 2005 hospital stay). (*Id.*) But, as the ALJ pointed out, doctor "treatment notes reflect that the [Plaintiff] was smoking 8-10 cigarettes and consuming 3-8 beers a day."[20] (Tr. 17.)

It is the ALJ's role to make credibility determinations, and those determinations are entitled to "great deference." *McKnight v. Astrue*, 340 F. App'x 176, 181 (5th Cir. 2009) (citing *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000)). Here, there is more than substantial evidence to support the ALJ's finding that Plaintiff's hearing testimony was not credible.

Ultimately, the Court must determine whether the ALJ's decision is supported by substantial evidence in the record as a whole; in particular, the issue here is whether there is substantial evidence to support the ALJ's finding that Plaintiff is at least literate. *See Masterson*, 309 F.3d at 272 ("We affirm the Commissioner's findings whenever supported by substantial evidence."). It bears repeating that substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Boyd*, 239

---

[20]   Plaintiff's hearing testimony is contrary to what he told several medical sources. While admitted at Rio Grande Regional Hospital in June of 2005, Plaintiff reported to Drs. Gomez and Alhalel that he "smokes approximately 8 to 10 cigarettes per day" and "drinks between 5 and 8 beers a day." (Tr. 144-47.) Plaintiff was "strongly" advised to "quit drinking and smoking." (Tr. 145.) One year later, in June 2006, Plaintiff reported to Dr. Popek that he had decreased his alcohol consumption to three beers daily and decreased his tobacco intake to three cigarettes daily. (Tr. 193-94.) Similarly, the next year, in May 2007, Plaintiff reported to Dr. Salazar that he continued to drink six beers daily and smoke half a pack of cigarettes. (Tr. 247-48.)

25

F.3d at 704.  It is more than a mere scintilla, but less than a preponderance.  *Id.*  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision.  *Id.*

Applying this standard in light of the evidence in the record, the ALJ's literacy finding is supported by substantial evidence.  To summarize, such evidence includes:

- Plaintiff's statement in his Disability Report that he can read and write.
- Plaintiff's formal schooling through the fifth grade.
- No indication of reading or writing difficulties during Plaintiff's face to face interview.
- Plaintiff's questionnaire response stating that his physical impairments do not limit his ability in "reading [a] newspaper."
- Plaintiff's ability to pay the household bills and do grocery shopping.
- The ALJ's finding that Plaintiff's hearing testimony was not credible.

In arguing that the ALJ's literacy finding is unsupported, Plaintiff cites several cases, including the Fifth Circuit's decisions in *Albritton* and *Pena*.  In *Albritton*, the Fifth Circuit held that the Commissioner erred in finding that the claimant was literate. 889 F.2d at 643.  Although the claimant had a fourth grade education, "both [he] and his wife testified that he could neither read nor write, but could only sign his name."  *Id*. at 642.  Because there was "uncontradicted evidence that [the claimant] was functionally illiterate," the Fifth Circuit found that the claimant's formal schooling many years earlier "was no longer meaningful."  *Id*. at 642-43.  In the absence of any other evidence, the Commissioner erred in finding that the claimant was literate.  *Id*.

In *Pena*, the Fifth Circuit affirmed the ALJ's finding that the claimant was at least literate, despite a doctor's opinion (based on intelligence and achievement testing) that the claimant was functionally illiterate.  271 F. App'x at 384.  The Fifth Circuit found that the opinion was not "uncontroverted."  *Id*.  In particular, the claimant testified that he could write a "little bit," and his wife indicated that he could grocery shop with a list she

prepared.  *Id*.  The claimant also "admitted he had passed the sixth grade, which the regulations consider evidence of marginal education."[21]  *Id*. at 384-85 (footnote omitted). The Fifth Circuit found that "the ALJ had sufficient evidence to conclude that [the claimant] satisfied the regulation's literacy standard."  *Id*. at 385.

The Fifth Circuit's rulings in *Albritton* and *Pena* are instructive here.  Unlike *Albritton*, where the testimony of both the claimant and his wife was "uncontradicted," here Plaintiff's hearing testimony is contradicted by his own written statements and is inconsistent with observations during his interview, his completion of the fifth grade, and his daily activities (paying bills and grocery shopping).  Significantly, the ALJ also found that Plaintiff's testimony lacked credibility—a finding that is amply supported by the record.  The instant case is more akin to *Pena*, where the Fifth Circuit found that the record contained substantial evidence to support the ALJ's finding that the claimant was literate.  In *Pena*, the claimant's hearing testimony (he could write a "little bit"), his completion of the sixth grade, and his activities (including grocery shopping) supported the ALJ's finding that he was literate.  271 F. App'x at 384-85.  Similar evidence is present here.[22]

---

[21]  On appeal, the claimant challenged the lower court's reliance on his completion of the sixth grade as substantial evidence that he was literate.  *Id*. at 385.  The Fifth Circuit found it unnecessary to address that argument because there—like here—the "record contains more evidence regarding [claimant's] literacy than his highest grade completed."  *Id*.

[22]  Plaintiff invites the Court to follow the Eleventh Circuit's decision in *Wolfe v. Chater*, 86 F.3d 1072 (11th Cir. 1996), which he characterizes as "directly analogous" to the facts of this case.  (Docket No. 7, at 10.)  In *Wolfe*, like here, the claimant argued that he was illiterate and that the ALJ should have found him disabled pursuant to Grid Rule 202.09.  *Id*. at 1075.  The evidence in that case consisted of the claimant's testimony that he could neither read nor write (even though he had a seventh grade education), as well as the testimony of two vocational experts: one testified that the claimant "could read a total of five words that were approximately the first grade level" and the other testified

27

In sum, Plaintiff has failed to show that he was prejudiced by the ALJ's error in stating that Plaintiff had a "limited education" (as defined in the regulations). The ALJ's ultimate decision was based on the finding that Plaintiff is at least literate, which is supported by substantial evidence.[23]

### III.  CONCLUSION

Based on the foregoing, Plaintiff's claim that the ALJ committed reversible error lacks merit. Plaintiff's motion for summary judgment (Docket No. 6) is DENIED, and

---

that the claimant was "functionally illiterate." *Id*. at 1076. The Eleventh Circuit held that because the "only specific evidence" of the claimant's reading level was that he could "read only five first grade words," the ALJ's finding that the claimant had a marginal education was not supported by substantial evidence. *Id*. Here again, the facts of the instant case are distinguishable because there is evidence controverting Plaintiff's hearing testimony (as discussed above), including Plaintiff's own earlier statement that he could read and write. Contrary to Plaintiff's suggestion, the holding in *Wolfe* is not inconsistent with the conclusion that the ALJ's literacy finding in this case is supported by substantial evidence.

[23]   Plaintiff also argues that the vocational expert's testimony "does not cure the ALJ's unsupported finding of [Plaintiff] Gonzalez's education level." (Docket No. 7, at 11.) Plaintiff raised this point in anticipation that the Commissioner would argue that the ALJ's erroneous "limited education" finding was cured by the vocational expert (*id*.), but the Commissioner does not appear to make this argument. In any event, for the reasons discussed above, the ALJ's literacy finding is supported by substantial evidence apart from the vocational expert's testimony (which does not include any opinion on Plaintiff's education level). As such, it is unnecessary to address whether or not the vocational expert's testimony cured any error. To the extent that Plaintiff intended to make the separate argument that the ALJ also erred in posing a hypothetical question that was defective with regard to Plaintiff's education level, that argument also lacks merit. The vocational expert was present during the hearing and heard Plaintiff's testimony, including his statement that he could not read and write. (Tr. 22, 26.) The ALJ asked the vocational expert to "consider a hypothetical individual Claimant's age, *education* and work background as the Claimant." (Tr. 38 (emphasis added).) Contrary to Plaintiff's suggestion, the ALJ did not ask the vocational expert to assume that Plaintiff had an education level that corresponded to his "formal education in fifth grade." (Docket No. 7, at 11.) Given that the vocational expert heard Plaintiff's testimony about his abilities in reading and writing, there is no reason to believe that his opinion about available jobs was based on a misperception of Plaintiff's abilities in those areas.

the Commissioner's motion for summary judgment (Docket No. 8) is GRANTED.   A judgment consistent with this memorandum opinion will be entered.

The Clerk shall provide a copy of this memorandum opinion to counsel for the parties.

DONE at McAllen, Texas on March 29, 2013.

_____
Peter E. Ormsby
United States Magistrate Judge